IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 8, 2020

**STATE OF TENNESSEE v. KENNETH D. RUDD SR.**

**Appeal from the Circuit Court for Fayette County**
**No. 17-CR-234        J. Weber McCraw, Judge**

_____

**No. W2019-00692-CCA-R3-CD**

_____

A Fayette County Circuit Court Jury convicted the Appellant, Kenneth D. Rudd Sr., of rape and incest. The Appellant was sentenced as a Range II, multiple offender to a total effective sentence of seventeen years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions and the length of the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Kari Weber (at trial and on appeal), Somerville, Tennessee, for the Appellant, Kenneth D. Rudd Sr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Mark Edward Davidson, District Attorney General; and Falen Chandler and Raven Icaza, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

A Fayette County Grand Jury returned an indictment charging the Appellant with rape, incest, and bribery of a witness. The rape and incest charges stemmed from the Appellant's sexual assault of his seventeen-year-old daughter on August 6, 2016. The

Appellant was charged with bribery of a witness because he allegedly gave the victim[1] forty dollars after the sexual assault. The Appellant was convicted of rape and incest and was acquitted of bribery of a witness.

At trial, the victim testified that around 12:30 or 1:00 p.m. on August 6, 2016, her grandmother, S.W., drove her and her three-month-old baby to Gurkin's gas station in Fayette County where the Appellant was working. The victim was meeting the Appellant so that she could ride with him to her nephew's birthday party later that day. Approximately twenty minutes after the victim arrived, the Appellant left work and took her to a room he had just rented at the Q Inn, which was located next door to the gas station. The Appellant left the victim and her baby in the room and returned to work.

The victim said that approximately one hour later, while she was in the restroom, she heard the Appellant return to the hotel room. The Appellant walked into the restroom. The victim's pants and underwear were down because she had just used the restroom. The Appellant made a "sexual remark" to the victim, and she told him to "get the f[***] back." The Appellant grabbed the victim's shoulder, and, as she tried to get away, she tripped over a step between the restroom and the bedroom. She fell onto the floor, and the Appellant kissed her buttocks. When she stood up, he pushed her, and she fell face-down onto the bed. The victim said that the Appellant "started forcing himself on [her]" and put his penis into her vagina. The victim told him to stop. He called her by her sister T.'s name and told her that she "know[s] how it feels because [she] had a baby." The victim did not recall if the Appellant ejaculated.

The victim said that the Appellant eventually stopped, left the room, and went to a Fred's store across the street. The victim, who did not have her cellular telephone, noticed that the Appellant had left his cellular telephone on a table in the room. She called her grandmother, S.W., and sent her boyfriend, M.I., a text message about what the Appellant had done. The Appellant returned to the room, and the victim "hung up" the telephone. The Appellant told the victim not to tell anyone about what had happened.

The victim said that after the Appellant returned to the room, her sister L. and the Appellant's girlfriend came to the hotel room. The Appellant and his girlfriend changed clothes, and everyone rode in the same car to Covington for the birthday party. The victim said that when she arrived at the party, she saw forty dollars inside her baby's bag. The money had not been there earlier that day. She knew the Appellant was the only person around the bag and surmised that he must have put the money in the bag. After the party, the Appellant and his girlfriend drove the victim home.

_____

[1] It is the policy of this court to not reveal the identity of victims of sexual crimes.

The victim said that prior to the day of the offense, she had not seen the Appellant for approximately one year and that she had seen the Appellant approximately nine times in her lifetime. The victim said, "We really didn't have no relationship because he never was really around. We didn't have no like bad, bad relationship." She met the Appellant that day because she had been told that he was going to the party, and she needed a ride to the party. She explained that she did not have her own car and could not get away from the Appellant after the assault.

The victim said that the Appellant drank more than one beer prior to the offense and that she did not drink any alcohol that night. The victim said that when she got home, she "broke down" and told her mother what the Appellant had done. The victim's mother called the police and then called S.W.

On cross-examination, the victim said that earlier in the day, she was at her mother's house in Brownsville. The victim's mother was disabled and could not drive the victim to the party. S.W. picked up the victim at the victim's mother's house and drove her to meet the Appellant. S.W. had something to do later that day and could not drive the victim to the party.

The victim said that when the Appellant left the room after the assault, she called S.W. and told her that the Appellant had raped her. The victim was crying so much that S.W. could not understand her. The victim ended the call when the Appellant returned to the room. The victim acknowledged that she did not attempt to call the police while the Appellant was out of the room. She explained that she did not attempt to leave the room because she was not from Somerville and did not know where to go. The victim remained in the room until L. arrived. The victim said that she used the Appellant's cellular telephone to send L. text messages, encouraging her to "hurry up and get up here."

The victim said that during the drive to the party, she had the Appellant's cellular telephone and that she sent M.I. text messages telling him about the rape. The victim stayed at the birthday party for approximately three hours. While at the party, she did not tell any family members about the rape. She explained, "I'm not really comfortable with them because I don't hang around my dad or his family. Only person I talked to was like my sister and brother." Her brother left the party, and her sister "was drinking and stuff." During the party, the victim did not ask to borrow a telephone to call the police; however, she sent text messages to M.I. while the Appellant was driving her home. The victim said that M.I. did not contact the police because he was at work.

The victim said that when she arrived home, M.I. was outside, and he confronted the Appellant and asked "'What did you do?'" The Appellant responded, "'[W]hat you

talking about,'" and ran back to his car. The victim said that when she entered her mother's home, "[t]he first call was my grandma and my mama called the police."

The victim said that at some point, she saw forty dollars in her baby's bag and that the Appellant told her, "'I left you something in your baby bag.'" The victim assumed that the Appellant put the money in the bag. The victim said that she had not told the Appellant she needed anything for the baby and that the Appellant had never bought anything for the baby. The victim said that the Appellant had never paid child support for her and that she never talked to the Appellant about money.

The victim said that her mother initially contacted the Brownsville Police Department but that they told her to contact the Somerville Police Department because the crime occurred in Somerville. The victim recalled sending M.I. a text message on the way home from the party that said, "'Don't say nothing. Me and my grandma got this all planned out.'" The victim acknowledged that she had spoken with her grandmother for only a few seconds.

On redirect examination, the victim explained that she thought the money in the baby's bag was from the Appellant "[b]ecause he said he left me something in my bag and I didn't have no money at first and my bag was only in the car with him and his girlfriend." The victim said that her mother had no problems with the Appellant and had not been having conversations with the Appellant about child support.

S.W., the victim's grandmother, testified that on August 6, 2016, she gave the victim a ride to Gurkin's in Somerville, which was where the Appellant worked. S.W. left the victim and her baby with the Appellant around noon.

S.W. said that at approximately 2:00 or 3:00 p.m., the victim called her. The victim, who was "crying hysterical," said that "her father had raped her." They were unable to continue the conversation at that time, but S.W. spoke with the victim around 6:00 or 7:00 p.m. while S.W. was at the victim's mother's house. Thereafter, S.W., the victim, and the victim's mother went to the police station in Somerville and then to the crisis center in Memphis.

The victim's boyfriend, M.I., testified that he was the father of the victim's child. He said that on August 6, 2016, he and the victim were in a relationship and lived with his mother. Sometime before noon, he received text messages from the victim while he was at work. The victim "said something like something had happened, she'd like to tell me something, like she didn't just tell me right then. She said I was going to be real mad."

- 4 -

M.I. said that when the Appellant brought the victim home, M.I. could tell that she had been crying. He said that the victim had told him "don't say nothing about what happened." M.I. asked the Appellant, "'What happened today?'" The Appellant acted as if he did not know "what was going on," and M.I. repeated the question. The Appellant "acted like he was reaching for something" then ran to his car and drove away with his girlfriend and the victim's sister in the car.

On cross-examination, M.I. said that he thought the victim had been sending him text messages from her cellular telephone. In her text messages, the victim said that she had something to tell M.I. that would make him "real upset," that she and her grandmother had talked, and that "they was going to handle it." M.I. identified a text message the victim sent which said, "[D]on't say nothing. Me and my grandma got this all planned out." M.I. asked, "She already know?" The victim responded, "Don't text back. I'm fixing to pull up. Yes, she know."

On redirect examination, M.I. said that he had seen the Appellant only one time prior to their confrontation after the party. On that occasion, the Appellant asked M.I. if he was "the one got my daughter pregnant." M.I. said that he was. M.I. said the victim did not have a close relationship with the Appellant, and she did not see him "often."

Kimberly Marsh testified that on August 6, 2016, while she was working as an officer with the Somerville Police Department, she received a call about a rape victim who was at the criminal justice complex (CJC). Officer Marsh and Chief Webb went to the CJC to meet the victim. Afterward, they took the victim to a rape crisis center. The officers waited outside the rape crisis center while the nurses performed a rape kit on the victim. A nurse gave the rape kit to Officer Marsh, who stored it in the police evidence locker until it was sent to the Tennessee Bureau of Investigation's (TBI) crime laboratory for testing.

On cross-examination, Officer Marsh said that she interviewed the Appellant and that he gave a handwritten statement. She recalled that the Appellant came to the police station willingly and that he was cooperative during the interview.

Toni Andrea Williams testified that she worked as a sexual assault nurse examiner at the Shelby County Rape Crisis Center. Williams said that she was on duty on August 7, 2016, and that she saw the victim. Williams spoke with the victim and asked what had happened to her. The victim was tested for sexually transmitted diseases and pregnancy, and a rape kit was collected.

Williams said that the victim reported, "'[W]hile I was using the bathroom my dad pushed me forward and I fell because my pants were down around my ankles. . . . [W]hile I was on the ground, he licked inside of my butt with his tongue. . . . [H]e pushed me down

on the bed, pulled my legs apart, and stuck his thing in me.'" The victim reported that the Appellant "forced vagina/penile penetration with no condom." The victim did not know if the Appellant ejaculated.

Williams said that the victim was calm and cooperative. Williams did not find the victim's demeanor to be unusual. Williams did not notice any physical injuries to the victim, which she stated was not uncommon in rape victims. Williams collected a rape kit from the victim and gave the rape kit to Officer Marsh.

Jessica Marquez testified that she was a forensic scientist with the DNA/serology section of the TBI's crime laboratory. Marquez said that the victim's rape kit contained five items which were submitted for testing: the victim's saliva standard, the victim's vaginal swabs, the victim's vulvar swabs, the victim's perianal swabs, and the victim's underwear. Marquez tested the vaginal swabs, and they were positive for the presence of spermatozoa. Marquez cut the swabs and put them in a tube for future DNA testing.

Marquez said that the rape kit was taken in August 2016 but that it was not tested until April 2017. She explained that the office had a forty-four-week backlog in casework, which could explain the delay in testing the items.

TBI forensic scientist Kristyn Meyers testified that she tested a saliva standard from the Appellant, a saliva standard from the victim, and vaginal swabs from the victim. The Appellant's sperm was found on the victim's vaginal swab. Meyers found an additional allele, but "due to that limited information interpretation of that single allele [was] deemed to be inconclusive."

Somerville Police Chief David Webb testified that on August 6, 2016, he received a call stating that a victim or a victim's family had contacted the Brownsville Police Department but that the victim and her family had been sent to the Fayette County Sheriff's Office because the crime occurred in Fayette County.

Chief Webb assigned Officer Marsh to work on the case with him, and they spoke with the victim. Thereafter, they took the victim to the rape crisis center where she was examined by a sexual assault nurse.

Meanwhile, Chief Webb sent officers to the Q Inn to secure the crime scene and to attempt to make contact with the Appellant. However, the Appellant was not in the room at that time, and the officers obtained and executed a search warrant on the room. Eventually, the officers made contact with the Appellant and had him come to the police department for an interview. During the interview, the Appellant acknowledged that the victim was his daughter. He said that he gave the victim forty dollars because he owed the

victim's mother child support, but he denied having sexual contact with the victim. After the police received the results of the DNA testing, they arrested the Appellant. The Appellant was interviewed again following his arrest. The Appellant said that "the test couldn't be right cause she had a bath and a shower right after."

On cross-examination, Chief Webb said that the Appellant voluntarily participated in the interviews and gave a DNA sample. Chief Webb acknowledged that the police sent items from the hotel room, including clothing, towels, and the bedspread, to the TBI for testing. The TBI informed Chief Webb that they did not test every item submitted. Chief Webb explained, "They start with the most obvious first. If they do not get a result off of those items, then they move to the next item. If they do get results from those first items, they do not move to the rest of the items at all . . . ."

Chief Webb said the Appellant claimed he gave the victim "forty dollars because of [the victim's] mother and the child support he owed." Chief Webb said that the police did not recover the forty dollars the Appellant gave the victim.

On redirect examination, Chief Webb said that the Appellant acknowledged that he left the victim and her baby alone in the hotel room for a time. Chief Webb never found a possible motive for the victim to make up the allegations.

The Appellant did not testify or put on proof.

The jury acquitted the Appellant of bribery of a witness but found him guilty of rape and incest. The trial court sentenced the Appellant as a Range II, multiple offender to concurrent sentences of seventeen years for the rape conviction and ten years for the incest conviction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions and the length of the sentences imposed by the trial court.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to sustain the Appellant's conviction of rape, the State needed to prove the "unlawful sexual penetration of a victim by the [Appellant]" and that "[f]orce or coercion [was] used to accomplish the act[.]" Tenn. Code Ann. § 39-13-503(a)(1). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the [Appellant's], or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). Further, "[a] person commits incest who engages in sexual penetration . . . with a person, knowing the person to be, without regard to legitimacy . . . [t]he person's natural . . . child . . . ." Tenn. Code Ann. § 39-15-302(a)(1).

In the light most favorable to the State, the proof at trial revealed that the Appellant, who was the victim's father, agreed to drive the victim to her nephew's birthday party. The Appellant took the victim to a hotel and left. The victim waited in the hotel room while the Appellant was gone. When the Appellant returned, the victim was using the restroom. The Appellant entered the restroom and made a sexual remark to the victim. As the victim tried to leave the restroom, she tripped and fell. The Appellant kissed her buttocks while she was on the floor. When the victim got up, the Appellant pushed her face-down onto the bed and forcibly raped her. The victim did not know if the Appellant ejaculated. Afterward, the Appellant briefly left the room, and the victim called her grandmother to report that the Appellant had raped her. The Appellant drove the victim, her sister, and his girlfriend to the party and afterward drove the victim home. The victim told her mother about the rape, and the police were called. The victim had a sexual assault examination,

and a rape kit was collected. The Appellant's sperm was found on the victim's vaginal swabs.

On appeal, the Appellant contends that the State failed to establish that he forcibly raped the victim. The Appellant notes that after the alleged rape, the victim remained in the Appellant's presence for several hours and did not attempt to leave or call the police when she had the opportunity. Essentially, the Appellant's claim is a challenge to the credibility of the victim's testimony that she was forcibly raped by the Appellant. State v. Luis Guillen, No. W2012-00826-CCA-R3-CD, 2013 WL 4007532, at *13 (Tenn. Crim. App. at Jackson, Aug. 2, 2013). Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). The victim testified that the Appellant used force, and our courts have repeatedly held that the testimony of a rape victim is sufficient standing alone to sustain a conviction. See State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

The Appellant also contends that the State did not fully investigate the case, noting the TBI's failure to test all of the items submitted by the State and the State's failure to charge him for approximately one year after the allegations. We note that in cross-examining the State's witnesses, the Appellant pointed out those alleged deficiencies. State v. Mack Mandrell Loyde, No. M2017-01002-CCA-R3-CD, 2018 WL 1907336, at *6 (Tenn. Crim. App. at Nashville, Apr. 23, 2018). The jury heard the testimony of the officers and the experts presented by the State as well as the Appellant's claims regarding the evidence and reconciled the evidence in favor of the State. Id. We conclude that the evidence is sufficient to sustain the Appellant's convictions.

## B. Sentencing

At the sentencing hearing, the parties agreed that the Appellant was a Range II, multiple offender and was subject to a sentencing range of twelve to twenty years for the rape conviction, which was a Class B felony, and six to ten years for the incest conviction, which was a Class C felony.

The presentence report reveals that the Appellant had four prior felony convictions: two aggravated assaults, an automobile burglary, and a forgery. The Appellant had numerous other prior misdemeanor convictions, including ten assault convictions, two domestic violence convictions, three theft convictions, two vandalism convictions, and

multiple convictions for driving on a revoked license and driving while intoxicated. Additionally, the presentence report reflects that the Appellant had previously violated probationary sentences on at least five occasions.

The trial court applied enhancement factor (1) that the Appellant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The court also applied enhancement factor (7) that the offenses involved a victim and were committed to gratify the Appellant's desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(7). The trial court found no mitigating factors.

The trial court sentenced the Appellant to concurrent sentences of seventeen years at one hundred percent for the rape conviction and ten years with release eligibility after serving thirty-five percent of the sentence for the incest conviction. The Appellant was also placed on the sexual offender registry.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

On appeal, the Appellant contends that the trial court erred by not imposing the minimum sentences in the range and that the sentences "do[] not match the severity of the offense[s] for which he is convicted." The record amply supports the trial court's application of enhancement factor (1), which alone supports the sentences imposed by the trial court. See State v. Rickey Lee Brown, Jr., No. M2015-01730-CCA-R3-CD, 2016 WL 4973078, at *4 (Tenn. Crim. App. at Nashville, Sept. 16, 2016); State v. Minlando Cordell Young, No. M2014-00115-CCA-R3-CD, 2014 WL 4794997, at *4 (Tenn. Crim. App. at Nashville, Sept. 26, 2014). The Appellant is not entitled to relief on this issue.

### III. Conclusion

The judgments of the trial court are affirmed.

_____
NORMA MCGEE OGLE, JUDGE

- 11 -